STRODDER *v.* SOUTHERN GRANITE COMPANY.

99   595
f129  216

If the general rule that one who, on the ground of fraud or of mental incompetency to contract, seeks to rescind an executed agreement of which he has received the fruits must, before bringing his action, make or offer to make restoration to the opposite party, admits of any exception because of the plaintiff's inability

from poverty to meet this requirement, such exception certainly cannot obtain unless the fraud remained undiscovered, or the mental incapacity continued, until after such fruits had been put beyond the power or control of the plaintiff.

*Atkinson, J.,* dissenting.

November 30, 1896. Argued at the last term.

Action for damages. Before Judge Clark. DeKalb superior court. August term, 1895.

*Thomas & Thomas* and *Erwin, Cobb & Woolley,* for plaintiff. *Albert H. Cox,* for defendant.

LUMPKIN, Justice.

On January 11th, 1893, William Strodder, while in the service of the Southern Granite Company, was very seriously injured. He brought an action for damages against the company, alleging that his injuries were caused by its negligence, without fault on his part. It further appeared from the allegations of his declaration, that he had signed a paper which purported, for a consideration therein recited, to have been executed in full accord and settlement of all claims for damages on account of the injuries received. It was also alleged that the plaintiff was, by the defendant's agent, craftily and fraudulently induced to sign the paper in question "while prostrated and wrecked by physical and mental torture resulting from the injury, and wholly incapacitated to execute any valid contract without counsel and assistance—defendant, by its agent, taking advantage of his helpless condition." The declaration in effect admitted the receipt of twenty dollars in cash by the plaintiff, and as to this matter prayed that, "being unable, without fault on his part, to repay the money, the court would not require him to repay it as a condition precedent to granting the relief he sought." This petition was dismissed on demurrer by the trial judge, whose judgment was affirmed. See 94 *Ga.* 626. The head-note there announced is here referred to as expressing the view which this court then entertained as to the law of

the case. Afterwards, Strodder filed a second declaration, in which he attempted to take the case out of the ruling under which his first action was defeated. In the opinion of the Chief Justice and the writer, the second declaration falls squarely within the principle of the decision made in the former case, and therefore cannot be maintained. The material allegations of the declaration now before the court are as follows:

"That, on the 9th day of February, 1893, in said county, while petitioner was still overwhelmed by the great calamity which had come upon him in the faithful service of said corporation, on said 11th day of January, 1893, as aforesaid, and while petitioner, prostrated by the shock and racked by the physical and mental pain and torture necessarily consequent thereon, was then and there wholly unable and incapacitated to make or execute any valid contract or agreement without the counsel and assistance of his friends, the said corporation, well knowing the premises and taking advantage of said helpless and desolate condition of petitioner, then and there, by and through Robert Schafer, the local manager and agent of said corporation, accompanied by W. F. Chapman and J. R. Marbut, came to the dwelling of petitioner, at Lithonia, Georgia, and into the room where petitioner was lying on his bed, sick, with no one to look after petitioner's interest but a colored boy about 12 years old, and took petitioner out of his bed and had petitioner to touch a pen and make his mark to sign some paper writing—petitioner did not know what, and could not understand for what, owing to his disordered, distressed and disabled condition of body and mind. That petitioner then and there, before touching said pen to sign said paper writing, asked said Schafer why he wanted petitioner to sign said paper writing, and said Schafer then and there replied that as petitioner was disabled, his name would no longer appear on the pay-roll of the men working for said company at said quarry kept by said Kelly, the 'walking boss,' and in order that petitioner should get his money, as provided in said paper writing, every pay day, regularly, for three months, it was necessary that the said paper be signed by petitioner and sent to the headquarters of said company. That petitioner then asked said Schafer

whether the said corporation was going to throw petitioner away when the three months were out, and said Schafer then and there replied, 'no'—that when the three months were out he, Schafer, would come back and make further arrangements with petitioner—that the doctor had told him that petitioner might be well in three months time. That what is [above stated] as having occurred in the room where petitioner was sick in bed, on said 9th day of February, 1893, in said county, was done quietly, quickly and hurriedly; and though the wife of petitioner was then in the landlord's service and in the landlord's mansion-house on the same premises, and distant but about fifty feet from the sick-room of petitioner, the said Schafer did not send for her, or even notify her of the said transaction. That the following is substantially a copy of the said paper writing to which the signature of petitioner was then and there procured by the said Schafer, as aforesaid, to wit:

"Lithonia, Ga., Feb. 9th, 1893.

"In consideration of the Southern Granite Company furnishing me with the required medical attention to my eyes, which were injured in the manner hereinafter described, my wages, at the rate of one dollar and twenty-five cents per day, for three months, and twenty dollars, which has been paid to and accepted by me in full accord and satisfaction and settlement of and for all claims that I have, or have had, or may have, for damages by reason of any personal injuries by me in the service of said company, to date, and especially an injury received by me on the morning of January 11th, 1893. This adjustment being intended to settle any cause of action arising therefrom in my favor or in favor of any one claiming under, or through, or by me. The special injury referred to being to my eyes, and caused by the explosion of dynamite, or dynamite caps, in a drill-hole on the quarries of said company.

| [Signed] | | his |
| W. F. Chapman, | William | x  Strouder. |
| J. R. Marbut. | | mark |

"That shortly after the expiration of the three months time mentioned and referred to by petitioner, to wit, about the middle or latter part of May, 1893, petitioner went to the business office of said corporation in Lithonia, and stated to said Schafer that the three months were out,

and asked him what said company was going to do for him, and that said Schafer replied, then and there, that said company would give him fifty dollars and transportation for himself and wife to Greenwood, South Carolina; that was all the company could do for him, as the company could not afford to keep petitioner up as long as petitioner lived.   That petitioner then and there declined to accept said offer of fifty dollars in money and transportation, as aforesaid, in full and final settlement of his claim for damages against said corporation, and then and there, for the first time, suspected that petitioner had been overreached, entrapped and defrauded by said corporation.   That, the premises considered, said paper writing, bearing date the 9th day of February, 1893, was, on said 9th day of February, 1893, in said county, wrongfully and fraudulently procured from petitioner for a grossly inadequate consideration, and that the alleged contract of accord and satisfaction therein set forth is void *ab initio.*"

The declaration prayed that the court would not "require petitioner to repay the said consideration set forth and mentioned in said paper writing, as a condition precedent to granting petitioner the relief prayed for"; that the writing be canceled; that he be awarded damages to compensate him for the personal injuries inflicted upon him by the defendant, "and that due provision be made in the verdict and judgment for the repayment to said corporation by petitioner of the amount that may appear to have been the real and correct consideration of said paper writing, if any."

While the declaration does not, in terms, aver that the plaintiff received and used money paid to him by the defendant under the settlement referred to, no reasonable or fair construction of the above quoted allegations could leave it in the least degree doubtful that he did receive some amount from the defendant, and had disposed of the same before the bringing of either action.   It is also to be observed that, taking these allegations all together, they do not make a case of total mental incapacity to contract at the

time the plaintiff signed the paper releasing the defendant from further liability for damages. It will be noticed that he inquired of the defendant's agent as to the latter's reasons for desiring him to sign the paper, and that he apparently acted upon the information given him by the agent in reply. Assuming as true what the declaration alleges in this connection, an outrageous fraud was perpetrated upon the plaintiff; but it would seem that he was acting with at least some degree of intelligence with reference to the matter in hand, and was simply overreached. Indeed, his chief complaint as to the invalidity of the paper is embraced in his assertion that it was "wrongfully and fraudulently procured from petitioner for a grossly inadequate consideration." While he does allege that it was void *ab initio*, he does not distinctly aver that this was so because of mental incapacity on his part to contract, nor does he undertake to set forth facts showing that this was necessarily true of the instrument in question. Nevertheless, we shall deal with the case as if the declaration were sufficiently full and unequivocal in this respect. So regarding it, the Chief Justice and the writer are unable to perceive any material distinction between the two declarations filed by the plaintiff; for it does not in the last appear that he disposed of the money while in a state of mental incompetency, or before he discovered the fraud which had been practiced upon him. In these respects the second declaration has the same infirmities which characterized the first; and for aught that appears in either, the plaintiff knew when he spent the money that a gross deception had been practiced upon him, and was rationally capable of determining whether or not he would use the money in hand—thus ratifying the agreement—or repudiate the agreement by returning, or offering to return, the money and bringing his action.

If this view is correct, the decision appearing in 94 *Ga.*, *supra*, even if erroneous, is absolutely binding upon the

plaintiff, because in consequence of it the matters of controversy between him and the defendant in error are *res adjudicata* and cannot, as between these parties, ever become the subject-matter of review.   However, a majority of the court are satisfied that the law was correctly laid down in the first instance.   Unless, in a case like this, the plaintiff plainly alleges facts showing that his inability to make restitution arose from causes beyond his control, a court of equity cannot, merely because of a present inability on his part from poverty to restore the original status existing between himself and his adversary, grant the relief he seeks.    If any exception, based upon the ground of poverty, can be engrafted upon the general rule applicable in such cases, the court will carefully and diligently inquire whether or not the inability to make restoration resulted from the plaintiff's own conduct, or arose from causes over which he had no control.   Certainly, if it appeared that the plaintiff, through his own voluntary act, deliberately placed himself in a situation rendering restoration impossible, the essential element of equity would be entirely wanting, and the fact of poverty would be utterly immaterial.

In cases where infants purchase, and subsequently part with, property before arriving at majority, it has been held, because of a presumed want of capacity on their part to properly take care of property during minority, that they are not bound, and will not be required to make restoration.   The rule as to persons temporarily laboring under mental disability is, however, quite different; for if they rationally and deliberately, during an interval of mental responsibility, apply the consideration received from the opposite party to their own use, they will be required to make restoration—at least to the extent of the benefit actually enjoyed by them.   As to persons capable of contracting, "all the cases are agreed that one who was induced to enter into a contract through the fraudulent contrivances or

fraudulent representations of the opposite party may rescind the contract, provided he can, by a return of the property received under the contract, place the other party *in statu quo.*" "An offer to rescind should be accompanied by a tender of the return of the property. Nothing else will absolve the buyer from payment." "Unless the consideration is utterly worthless, it must be returned." The above quoted extracts are to be found in an article entitled, "Rescission of Contracts—Return of Consideration" (18 Cent. Law J. 482-487), written by Mr. Crosby Johnson, in which he enters upon a full and excellent discussion of the whole subject, citing numerous authorities. This article is referred to, and to a large extent adopted as the text, in Wait on Fraudulent Conveyances, pages 703-705, wherein the cases in support of the doctrine recognized and applied in the present case have been carefully classified and cited.                    *Judgment affirmed.*

ATKINSON, Justice, dissenting.

Notwithstanding the performance of the apparently rational physical act of executing a written evidence of a contract, if, at the time of the performance of such act, the party sought to be charged was incapable, in consequence of mental infirmity, to enter into the contract itself, he will not be bound, and the mere physical acceptance of the fruits of such an agreement, while still mentally incapable of understanding the nature of his act, will not serve as a ratification of an agreement apparently entered into under such circumstances, and therefore, whether the writing entered into under such circumstances which purports to operate as evidence of an accord and satisfaction of a pre-existing right of action, is binding, is dependent, not upon the mere physical act of apparently receiving moneys in satisfaction of such cause of action, but upon whether the mental condition of the person so receiving it was such as to have enabled him originally to enter into the contract of accord and satisfaction, or such as to enable him knowingly

to ratify such a transaction, the evidence of which was executed while he was under a disability to contract, because of his mental condition.

If no contract was made, then the plaintiff received no money in pursuance of that contract, and is, therefore, not bound to make restitution, but he can bring his action upon the original cause of action. Whether in the present case the alleged contract was originally binding, or whether it afterwards became so because of its ratification, were questions for the jury, and under the facts stated in the declaration the court erred in sustaining the demurrer.